FILED
SEP 26 2024
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) No. | 4:24-cr-00508 MTS |
| ) | |
| ERIC BAILEY, ) | |
| ) | |
| Defendant. ) | |

## INFORMATION

The government charges that:

## INTRODUCTION

At all times material to this Information, unless otherwise specified below:

1. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2. The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

1

3. A controlled substance assigned to "Schedule II" meant that the drug had a high potential for abuse and a currently accepted medical use in treatment in the United States, or the drug had a currently accepted medical use with severe restrictions.

4. Pursuant to the CSA and its implementing regulations:

   a. Oxycodone was classified as a Schedule II controlled substance. Oxycodone was used to treat severe pain and, as with other opioids, was highly addictive. The 30 mg oxycodone pill was the highest-strength, short-acting pill form of the drug commercially available, and it was commonly known among manufacturers, distributors, pharmacies, practitioners, and law enforcement to command substantial street value, and to be in particularly high demand, on the black market in Houston, Texas. Oxycodone 30 mg pills had a street value in the Houston area of approximately $1 per milligram.

   b. Hydrocodone was classified as a Schedule II controlled substance. Hydrocodone was used to treat severe pain. Hydrocodone, as with other opioids, was highly addictive. The 10-325 mg hydrocodone pill was the combination-pill form of the drug with the most hydrocodone and least acetaminophen commercially available, and it was commonly known among manufacturers, distributors, pharmacies, practitioners, and law enforcement to command substantial street value, and to be in particularly high demand, on the black market in Houston, Texas. Hydrocodone 10-325 mg pills had a street value in the Houston area of approximately $1 per milligram.

5. To lawfully distribute controlled substances like oxycodone and hydrocodone, companies had to register with the Drug Enforcement Administration ("DEA") and comply with laws and regulations imposed by the CSA. Registered distributors were required to maintain "effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels," 21 U.S.C. § 823(b)(1), and to report to the DEA "suspicious orders," which were defined by regulation as including "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency," 21

C.F.R. § 1301.74(b). Distributors also had to report all inventories, acquisitions, and dispositions of all Schedule I and II controlled substances, and of Schedule III narcotics, to DEA's Automation of Reports and Consolidated Orders System (referred to throughout this Information as "ARCOS").

6. With exceptions not applicable here, only appropriately licensed and registered pharmacies could dispense controlled substances, and only pursuant to legitimate prescriptions filled by an appropriately licensed and registered pharmacist acting in the usual course of his professional practice. *See* 21 C.F.R. §§ 1306.04 & 1306.06.

## DEFENDANT AND DISTRIBUTOR

7. Defendant **ERIC BAILEY** was a resident of St. Louis, Missouri, within the Eastern District of Missouri. He owned and operated Emed Medical Company, LLC ("Emed"), a distributor of pharmaceutical drugs, from its principal place of business, at 11551 Adie Road, Maryland Heights, Missouri 63043, in the Eastern District of Missouri.

8. At all relevant times, **ERIC BAILEY** had ultimate control over Emed's purchase and sale of controlled substances. This included acquiring controlled substances from manufacturers and other distributors; setting the prices that pharmacy customers paid for controlled substances; approving the sale of controlled substances to new customers; setting limits on how many, and what kind of, controlled substances Emed's customers could order; and setting purported compliance protocols for new and existing customers.

*Continued on next page...*

## EMED'S DISTRIBUTION OF HYDROCODONE 10-325 MG AND OXYCODONE 30 MG TO HOUSTON AREA PHARMACIES

9. According to data that Emed reported to DEA's ARCOS database, from 2007 through the end of 2011, Emed did not sell a single pill of hydrocodone 10-325 mg or oxycodone 30 mg, anywhere in the United States. In 2012 and 2013, Emed sold around 5,000 and around 50,000 oxycodone 30 mg pills, respectively, most of which were distributed to independent pharmacies in the Houston, Texas area; and no hydrocodone 10-325 mg pills. In 2014, Emed sold around 100,000 oxycodone 30 mg pills, and over 400,000 hydrocodone 10-325 mg pills, almost all of which Emed sold to independent pharmacies in the Houston, Texas area.

10. From 2015 through 2021, Emed—a distributor headquartered in Missouri—sold to independent pharmacies in the Houston area more than 1,000,000 additional oxycodone 30 mg pills, and more than 10,000,000 additional hydrocodone 10-325 mg pills, which had a total street value of at least approximately $130,000,000. During the same timeframe, Emed sold virtually no other pills that were ARCOS-reportable, anywhere in the United States.

11. Starting in late 2017, Emed began to purchase hydrocodone 10-325 mg and oxycodone 30 mg from Manufacturer A. To receive rebates from Manufacturer A (referred to in the industry as "chargebacks"), **ERIC BAILEY** was required by Manufacturer A to report to Manufacturer A the amount of Manufacturer A's hydrocodone 10-325 mg and oxycodone 30 mg that Emed's Houston-area customers purchased each month. After chargebacks, Emed bought 100-count bottles of oxycodone 30 mg from Manufacturer A for around $20. Emed sold the same bottles to Houston-area pharmacy customers for $250 or more. Emed's sales of Manufacturer A's

hydrocodone 10-325 mg pills to Houston-area pharmacies were similarly lucrative.

12. All told, from in or around 2019 through in or around late 2021, Emed purchased nearly 3 million pills of hydrocodone 10-325 mg and oxycodone 30 mg—and virtually nothing else—from Manufacturer A.

13. In or around December 2021, Manufacturer A notified Emed that it intended to discontinue all controlled substance sales to Emed. Manufacturer A cited, among other things, publicity around law-enforcement operations in Houston that resulted in arrests of Emed pharmacy customers, and red flags for diversion—i.e., that the pills were being sold by Emed's pharmacy customers onto the black market—that were apparent in the chargeback data that Emed submitted to Manufacturer A. Manufacturer A indicated it would not resume selling controlled substances to Emed unless and until Emed retained a third-party compliance consultant and implemented the consultant's recommendations to improve Emed's due diligence programs.

14. Emed retained a compliance consultant but did not implement the consultant's recommendations. Instead, on or about August 12, 2022, **ERIC BAILEY** caused Emed to purchase and to possess, from Manufacturer B, 277 bottles of oxycodone 30 mg pills and 75 bottles of hydrocodone 10-325 mg pills, with the intent to distribute them in a manner not authorized by law; namely, to possess with the intent to distribute them to Emed's Houston-area pharmacy customers that, **ERIC BAILEY** knew, distributed and dispensed the pills they purchased from Emed outside the usual course of professional practice, and without any legitimate medical purpose.

## COUNT ONE
## Possession with Intent to Distribute Hydrocodone and Oxycodone
## (21 U.S.C. §§ 841(a)(1) & (b)(1)(C))

15. Paragraphs 1 through 14 of this Information are re-alleged and incorporated by reference as if fully set forth herein.

16. On or about August 12, 2022, in the Eastern District of Missouri and elsewhere, Defendant,

**ERIC BAILEY,**

knowingly and intentionally possessed with the intent to distribute and dispense, in a manner not authorized by law, mixtures and substances containing detectable amounts of hydrocodone and oxycodone, each a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

## FORFEITURE ALLEGATION

The government further alleges there is probable cause to believe that:

17. Pursuant to Title 21, United States Code, Section 853, upon conviction of an offense in violation of Title 21, United States Code, Section 841, Defendant,

**ERIC BAILEY,**

shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offense.

18. The property to be forfeited includes, but is not limited to, PNC Bank Account No. xx-xxxx-8045, in the name of Emed Medical Company, LLC. Also subject to forfeiture is a sum of money equal to the value of any property, real or personal, constituting or derived from any proceeds traceable to such violation, which, including Account No. xx-xxxx-8045, is at least approximately $2.165 million.

19. If any of the property described above, as a result of any act or omission of Defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

SAYLER A. FLEMING
United States Attorney

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

*/s/ Drew Pennebaker*
DREW PENNEBAKER, #24083645TX
Trial Attorney

UNITED STATES OF AMERICA    )
EASTERN DIVISION    )
EASTERN DISTRICT OF MISSOURI    )

I, Drew Pennebaker, Trial Attorney for the U.S. Department of Justice, Criminal Division, Fraud Section, being duly sworn, do say that the foregoing information is true as I verily believe.

/s/ Drew Pennebaker
ANDREW PENNEBAKER # 24083645TX

Subscribed and sworn to before me this ___17th___ day of September, 2024.



Nathan M. Graves
NATHAN M. GRAVES
CLERK, U.S. DISTRICT COURT

By: /s/Jason W. Dockery
    DEPUTY CLERK